IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MAUMELLE MEDICAL CLINICS, INC. PLAINTIFF

v. Civil No. 10-5165

WAL-MART STORES, ARKANSAS, INC. DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Currently before the Court are Defendant's Motion for Summary Judgment and supporting documents (docs. 105-07), Plaintiff's Response and supporting documents (docs. 109-11), Defendant's Reply (doc. 113-14), and Plaintiff's supplemental responses (docs. 117-18). Also before the Court are Defendant's Motion for Voluntary Dismissal of Counterclaim (doc. 121), Plaintiff's Response (docs. 122-23) and Defendant's Reply (doc. 126). Plaintiff alleges claims pursuant to 42 U.S.C. §§ 1981 & 1982, the Arkansas Civil Rights Act, Ark. Code Ann. § 16-123-101 *et seq.*, and Arkansas common law claims for breach of contract and tortious interference with a contractual relationship.

As reflected herein, Defendant's Motion for Summary Judgment (doc. 105) is **GRANTED**, and Plaintiff's claims are **DISMISSED WITH PREJUDICE.** Defendant's Motion for Voluntary Dismissal of Counterclaim (doc. 121) is **GRANTED**, and Defendant's Counterclaim is **DISMISSED WITHOUT PREJUDICE.**

## I. Background

Many of the relevant facts in this case remain undisputed. To the extent that Plaintiff, in responding to Defendant's Statement of Facts, has relied on speculation or denials or allegations without a proper basis in fact or clear citation to facts already in the record, the Court will view such facts as essentially undisputed. *See* Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must. . . set out specific facts showing a genuine issue for trial."). To the extent they are relevant, those facts not specifically controverted by Plaintiff will be deemed to have been admitted pursuant to Local Rule 56.1. Where Plaintiff has provided some basis in fact or in the record, however, the Court has made all inferences in its favor, as is appropriate when making a summary judgment determination. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212-13 (8th Cir. 1998) (citing *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The following facts are undisputed, except where noted:

1. Jerry Poole d/b/a Maumelle Medical Clinics, Inc. filed this action on June 30, 2010. A first amended complaint was filed on July 16, 2010, substituting Maumelle Medical Clinics, Inc. ("MMC") as the plaintiff. A copy of the "Master Lease Agreement" ("Lease") between MMC and Walmart was attached as

Exhibit 1 to both complaints.

2. In late August or early September 2009, Poole contacted Walmart employee, Patrick Beasley, Senior Manager Innovations, Health Business Development, expressing interest in opening a clinic in a Walmart location.

3. Poole signed the Lease on behalf of MMC as Clinic Administrator on October 6, 2009, to operate a clinic at the Baseline Road Walmart location (Baseline Walmart) and Dr. John Agwunobi, Senior Vice President & President Health & Wellness, signed on behalf of Walmart on October 20, 2009.

4. The clinic opened on November 2, 2009, operating as a d/b/a of MMC called "30 Minute Clinic." The clinic was located at the front of the Baseline Walmart adjacent to other tenant spaces and across from the check out registers.

5. The permitted use of the leased space was "solely for the purpose of operating a healthcare clinic, which offers to the public such limited well patient care, preventative care, patient education services, and diagnosis and treatment of minor medical conditions and minor injuries as ordinarily provided in a primary care clinic by nurse practitioners, physician assistants, or physicians..." (Doc. 105-4, Lease, Appendix-1, ¶1(a)).

6. The relationship between Walmart and MMC was a landlord-tenant relationship. The Lease required, in part, that MMC "conduct

its business, at a minimum, in an efficient, first-rate, and reputable manner"; a prohibition on the use of the premises to conduct an illegal business; a prohibition against interfering with Walmart's business or the business of another tenant; a requirement to conduct business in a professional manner; a requirement to comply with all federal and state laws and an hours of operation requirement. (Doc. 105-4, Lease, ¶¶ 6.2(B), 6.10(F), 6.10(G), 8.1(B), 8.2(A), Appendix-1, ¶3).

7. On April 10, 2010, Asset Protection Associate Brenda Lee called the police to the Baseline Walmart because there was a crowd in front of the 30 Minute Clinic that was blocking customers exiting the cash register area from the exit of the Store.

8. Paragraph 6.10(G) of the Lease prohibits the tenant from unreasonably interfering with Walmart's or another tenant's business and prohibits "impending the free circulation of customer traffic." (Doc. 105-4, Lease, ¶6.10(G)).

9. A Walmart manager on duty on April 10, 2010, told Poole that "we have a bunch of people milling around here at the front of your clinic." (Doc. 105-1, Poole dep. p. 84).

9. Regarding the April 10, 2010 incident, Poole testified that:

> [t]he issue was that Dr. Schock on his own had decided to write those scripts, photocopy them and sign his name,...to speed up the process...What apparently had happened is that all those scripts he had written on that day before were not honored because they - appear to be - and it's okay to copy a script, but it had to have an

original signature... They were all trying to bring those scripts back that the pharmacy would not honor. (Doc. 105-1, Poole dep. p. 84).

10. Dr. Schock, the only physician at the 30 Minute Clinic, used a pre-printed prescription pad for Phenergan with codeine, which only required that he write the patients' names in the blanks because he thought it would be a time saver if he did not have to write out a prescription each time he prescribed Phenergan with codeine. (Doc. 105-7, Schock dep. pp. 45, 51-53).

11. Defendant contends a large number of patients received precriptions for Phenergan with codeine from Dr. Schock and some specifically asked for it. (Doc. 105-7, Schock dep. pp. 45, 51-53).

12. Phenergan with codeine is a controlled substance that can be addictive and abused.

13. Ryan Adams, one of the Pharmacists at the Baseline Walmart, testified that Dr. Schock's prescriptions of Phenergan with codeine "raised a red flag...writing for the same controlled substance over and over again, the large quantities that are prescribed are not usually prescribed. And pre-printing prescriptions with the drug written on it, all of those are warnings." (Doc. 105-8, Adams dep. pp. 125-28, 134).

14. Pharmacists have a professional obligation to look out for drug diversion, which is diversion of prescription medication

for purposes other than the medical condition for which the drug is prescribed. A pharmacist may not knowingly participate in drug diversion.

15. The pharmacists at the Baseline Walmart were aware that Phenergan with codeine is used to make a street drug called Sizzurp or Purple Drank.

16. Some of the pharmacists at the Baseline Walmart advised Randy Miller, Walmart's Pharmacy District Manager, they were concerned about Schock's prescribing practices for Phenergan with codeine.

17. These concerns were passed along to Paula Barton, Senior Director, Health & Wellness Compliance; Terry Crabb, Senior Investigator for Health & Wellness and Bruce Shepard, Director, Health & Wellness Innovations, all of whom were located in Walmart's Home Office in Bentonville. An attorney for the Health & Wellness Division was also consulted regarding the concerns.

18. According to Defendant, Bruce Shepard had one or more conversations with Poole regarding the concerns he had about the 30 Minute Clinic and asked Poole to follow up with him in writing with a response. (Doc. 105-5, Shepard dep. pp. 41-42). In Plaintiff's response to Defendant's Statement of Undisputed Facts it states the only conversation Poole had with Shepard was regarding the crowd problem on April 10,

2010, however, Plaintiff provided no citation to the record. (Doc. 110, p. 16).

19. Poole responded to Beasley in an email dated April 21, 2010, which acknowledged the conversation with Shepard regarding the number of patients on April 10, 2010, and acknowledged Dr. Schock's pre-printing of prescriptions. Poole's email stated, "[w]hen several pharmacies refused the scripts approximately (15) patients were returned to the clinic on 4/10/10 to have their scripts rewritten and that created a crowd control issue which was resolved promptly." Poole also acknowledged that he had discussed reducing the dosage of Phenergan with codeine with Randy Miller, and that a lower dosage of the drug would be appropriate. (Doc. 105-11, 4/21/10 email).

20. Following Poole's email, Shepard trusted Poole to resolve the situation. (Ex. 5, Shepard dep. P. 42-43).

21. On May 11, 2010, at the request of Chris Heinen, Market Area Asset Protection Manager, Pharmacists Darlene Bell and Adams gave written statements regarding their continued concerns about the operation of the 30 Minute Clinic. (Doc. 105-12, Bell Statement; Doc. 105-13, Adams statement). These statements were provided to Bruce Shepard by Terry Crabb. (Doc. 105-14, 5/12/10 email).

22. On May 14, 2010, Shepard initiated a meeting with key Health and Wellness managers to discuss the renewed concerns

regarding the 30 Minute Clinic based on the Baseline Pharmacists' reports that they continued to have concerns with the prescriptions being written and the activities involving the clinic. (Doc. 105-5, Shepard dep. pp. 50-54).

23. In the spring of 2010, Brandon Stanford, Asset Protection Coordinator, asked Brenda Lee, Asset Protection Associate, to begin surveillance of the activities which were occurring around the clinic, via the store's video monitors.

24. Pharmacist Bell informed Stanford that she felt something wasn't right with the prescriptions being written by the clinic physician, because the Pharmacy was getting requests to fill a large quantity of Phenergan with codeine. (Doc. 105-16, Stanford dep. pp. 32-34).

25. According to Defendant, Lee observed a number of activities surrounding the 30 Minute Clinic which she believed to be suspicious and which she presented to Stanford to review. Defendant contends there were two males who were observed to be in and around the 30 Minute Clinic space on a frequent basis and that Lee observed that these individuals were escorting people to the clinic, getting them clipboards and pens to complete paperwork and making contact with the clinic patients. Defendant asserts that one of the individuals appeared to be controlling the flow of patients and was frequently the first and last person in the clinic and in

frequent communication with the clinic personnel wearing scrubs. (Doc. 105-16, Stanford dep. pp. 22-37, 55-56; Doc. 105-6, Lee dep. pp. 84-107; Doc. 105-17, Stanford/Lee statement). Plaintiff denies these allegations without citing to the record.

26. On May 19, 2010, Defendant contends Lee observed suspicious activity on store video, specifically, money changing hands between one of the males she had frequently observed to be in and around the 30 Minute Clinic and a female patient after she exited the patient area. According to Defendant, Lee observed the female fill a prescription at the Pharmacy and another male meeting her by the store entrance to which she handed the prescription, the male checking the contents and then left the store. Defendant states Stanford reviewed the video, concurred with Lee's observation, and provided the information to his manager, Chris Heinen. (Doc. 105-17, Stanford dep. pp. 25, 59-60; Doc. 105-18). The individuals observed on the video were all African American.

27. Stanford emailed Heinen a timeline regarding the May 19, 2010 incident and four still shots taken from the store video. Heinen then communicated with Crabb at the Walmart Home Office and forwarded Stanford's email to him. Crabb then forwarded the email to Shepard. (Doc. 105-18, email string re Clinic Investigation). Shepard met with Walmart Health & Wellness

Compliance personnel and Health & Wellness Legal counsel on May 27, 2010 to discuss the information. (Doc. 105-5, Shepard dep. pp. 58-61).

28. According to Walmart, Dr. John Agwunobi, Senior Vice President & President Health & Wellness, made the decision to terminate the Lease on Friday, May 28, 2010, based on information provided by Shepard and Barton and his conclusion that the number of prescriptions for controlled substance by the Clinic was unlike any pattern Walmart had ever seen. (Doc. 105-19, Agwunobi dep. pp. 37-45; Doc. 105-5, Shepard dep. pp. 64-65; Doc. 105-20, 5/28/10 termination letter).

29. Shepard spoke to Poole by telephone early on Saturday morning, May 29, 2010, and informed him that Walmart had terminated the Lease. Poole received the letter from Dr. Agwunobi via FedEx on Tuesday, June 1, 2010. MMC does not deny this, but contends it did not receive adequate notice.

30. On June 4, 2010, Poole spoke to Beasley about his desire to keep the 30 Minute Clinic open and sent Beasley a follow-up email on June 6, 2010. In the email, Poole acknowledged that "Dr. Schock varied from our protocol on refills of Phenergan with codeine one time"; that he had "a serious discussion" with Dr. Schock; and that the 30 Minute Clinic should make changes and cure any defaults.

31. Poole, the owner and Clinic Administrator, and Dr. Schock are

Caucasian. Dr. Agwunobi is African American.

32. The Baseline Walmart is located in a low socioeconomic neighborhood, which has a predominately African American and Hispanic population. The operation of the 30 Minute Clinic did not change the demographics of the store's customers.

33. The demographic information Walmart provided to Poole during the discussions regarding MMC opening a clinic showed that the U.S. Census described the demographic within the zip code for the Baseline Walmart as "Urban African American."

34. Paragraph 6.2(B) of the Lease provides that the tenant "shall conduct its business, at a minimum, in an efficient, first-rate and reputable manner." Section D of paragraph 6.2 provides that a failure to comply with the provisions of 6.2 "materially breaches" the Lease. Paragraph 8.2 of the Lease is titled "Compliance" and requires compliance with all state and federal laws. Paragraph H of that section provides that any failure of the tenant to comply with its obligations under this Section 8.2 is a material breach. Paragraph 17.1 is titled "Default." Paragraph E of that section provides that "breach of any material obligation" of the Lease constitutes a default of the Lease.

35. Dr. Schock was the only licensed medical person working at the clinic. Schock denied that he was the medical director of the 30 Minute Clinic. Dr. Schock disclaimed any responsibility

for patient records, supervision of the personnel working in the clinic or what occurred in the clinic waiting room.

36. Dr. Schock could not recall the names of any of the personnel who worked in the clinic. Dr. Schock testified that he was 74 years old and had "some trouble with recent memory." When questioned about the differences in his recollection and Dr. Schock's, Poole stated that Dr. Schock was confused.

37. After the 30 Minute Clinic closed, Dr. Schock continued to work at the MMC clinic in Maumelle, as he had prior to the opening of the 30 Minute Clinic. His income varied from week to week while he worked for MMC based on the number of patients he saw. He sought out other employment in September or October of 2010 in order to even out his income and obtain better benefits; and he had no hard feelings against MMC. Dr. Schock was in bankruptcy in 2010. MMC has not suffered any liability to Dr. Schock was a result of the cancellation of the Lease.

## II. Standard of Review

In determining whether summary judgment is appropriate, the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem.*

*Co.*, 165 F.3d 602 (8th Cir. 1999). The Court must review the facts in a light most favorable to the party opposing a motion for summary judgment and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.,* 135 F.3d 1211, 1212-13 (8th Cir. 1998) (citing *Buller v. Buechler,* 706 F.2d 844, 846 (8th Cir. 1983)).

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in *Rule 56*, must set forth specific facts showing that there is a genuine issue for trial. *Ghane v. West,* 148 F.3d 979, 981 (8th Cir. 1998)(citing *Burst v. Adolph Coors Co.,* 650 F.2d 930, 932 (8th Cir. 1981)). In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Furthermore, "[w]here the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996)(quoting *Crain v. Bd. of Police Comm'rs,* 920 F.2d 1402, 1405-06 (8th Cir. 1990)).

## III. Discussion

### A. Discrimination

Sections 1981 and 1982 protect citizens' rights to make and enforce contracts and purchase both personal and real property without any impairment due to private or public racial discrimination. A plaintiff establishes a *prima facie* case under § 1981 by showing (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and (3) discrimination interfering with a protected activity (i.e., the making and enforcement of contracts). *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). The *prima facie* elements of a § 1982 case parallel those of a § 1981 case and require that a plaintiff show (1) membership in a protected class; (2) discriminatory intent on the part of the defendant; and (3) interference with the rights or benefits connected with the ownership of property. *See Zhu v. Countrywide Realty Co., Inc.*, 165 F. Supp.2d 1181, 1199 (D. Kan.2001); *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004).

Plaintiff alleges Defendant violated these laws by terminating the Lease due to Plaintiff's customers being African American. The Court finds Plaintiff failed to meet its burden of showing discriminatory intent by Defendant. The undisputed evidence shows that the Baseline Walmart is located in a low socioeconomic neighborhood, which has a predominately African American and

Hispanic population and the opening of the 30 Minute Clinic did not change the demographics of the store's patrons. Further, Walmart employee, Brenda Lee, who reported what she considered suspicious activity by Clinic patrons, is African American as is Dr. Agwunobi, who made the final decision to terminate the lease.

Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's §§ 1981 and 1982 claims, and they are DISMISSED WITH PREJUDICE. Further, as the elements are the same under ACRA, this claim is also DISMISSED WITH PREJUDICE.

**B. Breach of Contract**

Walmart terminated the Lease with MMC on May 28, 2010, due to MMC's failure to "conduct its business, at a minimum, in an efficient, first-rate and reputable manner"; use of the premises to conduct an illegal business; failure to conduct its business in a professional manner; and failure to comply with all federal and state laws. Plaintiff argues there is no proof that Poole was ever notified of any problem other than the prescribing issue and the crowd issue and that he resolved both of those.

Plaintiff failed to identify a provision in the Lease that requires notice and an opportunity to cure for a material breach of the Lease, and the Court finds none. Plaintiff does not address all of the other concerns Walmart had about the way the clinic's business was being conducted as set forth in the undisputed facts other than to make unsupported allegations that Walmart simply

wanted to close the Clinic because it served African Americans.

The Court finds there are no genuine issues of material fact as to whether MMC materially breached the Lease with Walmart. Accordingly, Defendant's Motion for Summary Judgment is GRANTED, and this claim is DISMISSED WITH PREJUDICE.

**C. Tortious Interference**

For a claim of tortious interference, Plaintiff must prove: (1) the existence of a valid contractual relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference inducing or causing a breach of the relationship by the defendant; (4) damage to the party whose relationship has been disrupted; and (5) improper conduct by the defendant. *Vowell v. Fairfield Bay Community Club, Inc.*, 346 Ark. 270, 276, 58 S.W.3d 324, 329 (2001). Whether a defendant's conduct is improper, is evaluated by seven factors. *Vowell*, 346 Ark. at 277, 58 S.W.3d at 329. Those factors are: "(1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (6) the proximity or remoteness of the actor's conduct to the interference; and (7) the relations between the parties." *Id.*

In its brief, Plaintiff merely argues without citing to any facts in the record that Defendant knew MMC had contracted with

Schock "to operate the 30 Minute Clinic and possibly others." And that Defendant's "unwarranted, racially based closing of the 30 Minute Clinic destroyed the contract." As previously stated, MMC's allegations that Walmart terminated the lease due to the race of the Clinic's patrons is unsupported by the record. MMC failed to show any improper motive on behalf of Walmart in terminated the Lease. No genuine issues of material fact exist concerning Plaintiff's Intentional Interference claim, and this claim is DISMISSED WITH PREJUDICE.

## IV. Conclusion

Based on the foregoing, the Court determines Defendant's Motion for Summary Judgment (doc. 105) is **GRANTED**. Plaintiff's claims are **DISMISSED WITH PREJUDICE.** Defendant's Motion for Voluntary Dismissal of Counterclaim (doc. 121) is **GRANTED**, and Defendant's Counterclaim is **DISMISSED WITHOUT PREJUDICE.** The parties are to bear their own fees and costs.

IT IS SO ORDERED **this 30th day of November, 2011.**

*/s/ Robert T. Dawson*
Honorable Robert T. Dawson
United States District Judge